

TCG

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

NO. 4:25-CR-25-1
NO. 4:25-CR-25-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL INFORMATION** |
| | ) | |
| LIFE TOUCH LLC | ) | |
| BRANDON EUGENE SIMS | ) | |
| | ) | |

The United States Attorney charges that at all times relevant to this

Criminal Information:

## I. STATUTORY AND REGULATORY BACKGROUND

### A. The Anti-Kickback Statute

**1.** Title 42, United States Code, Section 1320a-7b, makes it illegal to

knowingly offer or pay, directly or indirectly, overtly or covertly, in cash or in kind,

any remuneration, including any kickback, bribe, or rebate, to induce a person to

purchase, order, or arrange for the purchase or order of any service for which payment

may be made under a Federal health care program.

### B. The Medicaid Program

**2.** Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., (the "Act")

establishes the Medicaid Program. The North Carolina Medicaid Program is a state-

1

administered health care benefit program aided by federal funds and designed to provide medical assistance for low-income families and children that reside in North Carolina.

3.    Under the Act, each state has a single state agency to administer the Medicaid program for the benefit of recipients within its borders. In North Carolina, the Division of Health Benefits ("DHB"), formerly known as the Division of Medical Assistance or DMA, which is within North Carolina's Department of Health and Human Services ("DHHS"), administers the Medicaid program. The North Carolina Medicaid program, administered through DHB is referred to herein as "NC-Medicaid."

4.    An individual qualified to receive Medicaid's publicly funded assistance is referred to as a "beneficiary" or "recipient." For recipients, Medicaid functions like a medical insurance plan, which defrays the cost of receiving covered and medically necessary services. Covered services include substance abuse treatment and urine drug testing as part of substance abuse treatment.

5.    If qualified, an individual can enroll as a NC-Medicaid recipient. At the time of enrollment, a recipient is assigned a unique alphanumeric identification number by Medicaid, known as a Medicaid identification number. Recipients use their Medicaid identification numbers to receive covered services.

6.    Under Medicaid, a "provider" is an individual (rendering provider) or entity (billing providers) that furnishes Medicaid services to recipients under a provider agreement with the Medicaid Agency. In North Carolina, every provider

2

who participates in NC-Medicaid must apply for and be assigned a unique provider number by DHB. Rendering providers and billing providers must also obtain a federal identification number, known as a National Provider Identifier or NPI number.

7.  All NC-Medicaid providers must certify that they will comply with applicable federal laws, rules, and regulations, including the Anti-kickback statute.

8.  For a provider to obtain reimbursement from the Medicaid Program for providing services to a Medicaid recipient, the provider electronically submits a claim to NC-Medicaid, containing, among other things, the provider's name, address, and provider NPI number, the patient's name and Medicaid identification number, the date of service, a brief description of the charges, the provider's signature, and date of billing. For direct billings to NC-Medicaid, claims for services are electronically transmitted through a program known as "NCTracks."

9.  As an alternative to direct fee-for-service billing through NCTracks, NC-Medicaid also includes a managed care structure consisting of Prepaid Health Plans (PHPs). In Medicaid managed care, DHHS remains responsible for all aspects of NC-Medicaid but delegates the direct management of certain health services to PHPs. The PHPs assume financial risk through capitated contracts and contract with providers to provide services for beneficiaries. Claims for these services are submitted directly to the PHP, as opposed to being submitted through NCTracks, and are paid by and through the PHP. The claim generally includes, but is not limited to, the date of the alleged service, the Medicaid Identification Number of the beneficiary,

3

the nature of the service rendered, and the provider number or federally issued NPI number. As used herein, the term "NC-Medicaid" includes services billed to and paid by a PHP, as well as claims billed directly to Medicaid through NCTracks.

10.     As a component of the NC-Medicaid program, some beneficiaries, recipients of services for mental health, developmental disabilities or substance use disorders, contract with Medicaid Managed Care Organizations (MCOs). MCOs are organizations that contract with a network of providers to provide covered services to enrolled beneficiaries in exchange for payment from Medicaid. MCOs apply Medicaid's rules and regulations and serve as the PHP.

11.     NC-Medicaid, including any claims paid directly or through a PHP, is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

## C. Medicaid Audits

12.     As an administrator of NC-Medicaid benefits, MCOs are required by DHHS to have compliance plans which include methods to prevent, detect and report fraud, waste and abuse by providers who submit billings to such MCOs. MCO oversight of fraud, waste, and abuse, includes among other things, efforts to identify and eliminate violations of the Anti-Kickback Statute. To carry out this function, MCOs enter into written agreements with each provider that comply with applicable federal and state laws, rules and regulations. These agreements further require the provider to participate in the MCO's utilization management, care management, quality management, and program integrity functions. Providers are required to

4

comply with MCO audits and investigations that are meant to ensure integrity and efficiency to determine compliance with federal and state law, compliance with program rules and policies, and to ensure that Medicaid funds are used properly.

13.     The audit process typically involves a notification of the audit, a site visit, request for records, interviews of recipients, and interviews of employees or associates of providers.  During an audit, medical records, billing claims, and other documentation are reviewed to verify the accuracy and lawfulness of claims.

14.     An audit or investigation by an MCO may be initiated in a number of ways, including among other things, complaints from recipients, proactive data analysis showing billing irregularities or suspicious billing patterns, a history of noncompliance with Medicaid regulations, or a random selection process.

15.     As a part of these audits or investigations, providers are required to cooperate with all announced and unannounced site visits, post-payment reviews, and other program integrity activities conducted by an MCO.  Providers are required to provide truthful information and documentation when requested by the MCO. Providers who fail to grant prompt and reasonable access or who fail to timely provide specifically designated documentation to an MCO to properly investigate potential violations may be terminated from the network and NC- Medicaid programs.

16.     Substantiation of violations by program auditors may lead to further action to protect Medicaid dollars. These actions may include, among other things, recoupment from the provider of proceeds obtained as a result of the violation,

5

payment suspension, a law enforcement referral, and termination from the Medicaid program.

## D. Civil Fraud Investigation

17.    The Medicaid Investigations Division ("MID") of the North Carolina Department of Justice, Attorney General's Office, serves as the Medicaid Fraud Control Unit ("MFCU") for the State of North Carolina and investigates civil and criminal frauds upon NC-Medicaid. State MFCUs are charged under federal law with the authority to investigate violations of all applicable state laws, including false claims statutes and other civil authorities, pertaining to fraud in the administration of the NC-Medicaid program. As a central feature of MID's Medicaid oversight authority, compulsory production of requested documents and information from NC-Medicaid providers to MID is mandated by federal regulations. Furthermore, in its agreement with DHB, providers specifically agree to cooperate fully with requests for information by the state's MFCU.

18.    Under civil investigations, MID attorneys issue Civil Investigative Demands requesting the production of records to providers who are the subject of investigation. The production of documentary material in response to a Civil Investigative Demand must be made under a sworn certificate of production. As such, responses to such requests are expected to constitute truthful, genuine records.

19.    MID civil attorneys may also conduct interviews of employees or associates of providers and NC-Medicaid recipients as a part of their investigation.

6

Answers to questions by providers and their employees in such interviews are also expected to be truthful.

## II. FACTUAL BACKGROUND

### A. Relevant Parties and Entities

20.     LIFE TOUCH, LLC ("LIFE TOUCH") was a North Carolina corporation formed on June 16, 2009, in the Eastern District of North Carolina. BRANDON EUGENE SIMS ("BRANDON SIMS") was its organizer and only listed member. By no later than October 1, 2009, LIFE TOUCH had been registered as a Medicaid provider with NC-Medicaid providing substance abuse services.

21.     During times relevant to this Criminal Information, LIFE TOUCH was contracted with Eastpointe Human Services ("Eastpointe"), a MCO, to provide substance abuse services to Medicaid recipients within the Eastern District of North Carolina. BRANDON SIMS owned two LIFE TOUCH service locations: one in Goldsboro, North Carolina and one in Kinston, North Carolina.

22.     K.S. initially worked for BRANDON SIMS at LIFE TOUCH, providing such services as handling intakes of recipients and answering the phone at LIFE TOUCH's Kinston office.

23.     F.S. also worked for BRANDON SIMS at LIFE TOUCH. F.S. primarily worked as the office manager of the Kinston location. F.S. was also the mother of K.S. and BRANDON SIMS.

**24.** K.J. worked for BRANDON SIMS at LIFE TOUCH and served as the office manager of the Goldsboro location. K.J. also worked as the Medicaid biller for both LIFE TOUCH locations.

## B. LIFE TOUCH Provided Things of Value to Its Patients

**25.** Beginning at a time unknown but no later than January 2018, and continuing to a time unknown, but no earlier than November 16, 2023, LIFE TOUCH, by and through BRANDON SIMS, K.S., F.S., K.J., and others, routinely engaged in the payment of stored value cards, also known as "gift cards," to NC-Medicaid recipients to, among other things, incentivize their receipt of substance abuse services from LIFE TOUCH. In some instances, LIFE TOUCH, by and through its agents, also paid patients other things of value, such as cash and rent payments.

**26.** LIFE TOUCH, by and through its agents and patients, solicited patients to receive services at LIFE TOUCH by, among other things, informing them that they could receive a gift card in connection with each week of treatment. Patients had the opportunity to earn an extra gift card for bringing new patients to LIFE TOUCH for substance abuse services.

**27.** LIFE TOUCH recipients were required to attend treatment in order to receive a gift card. Although exact amounts varied, recipients who attended treatment five times per week generally received a $60 gift card; recipients who attended four times per week generally received a $50 gift card; and recipients who attended three times per week generally received a $45 gift card.

8

28.     LIFE TOUCH provided the gift cards on a weekly basis in connection with patients' receipt of substance abuse services, known as Substance Abuse Intensive Outpatient Program (SAIOP) and Substance Abuse Comprehensive Outpatient Treatment Program (SACOT).

29.     The purpose of the SAIOP and SACOT programs was ultimately to aid Medicaid recipients to live a drug-free life through counseling and treatment. Ideally, under these programs, Medicaid recipients were to receive the treatment that they needed, become sober, and transition to a lower level of care, at a significantly lower cost to the government.

30.     At LIFE TOUCH, however, recipients routinely exhausted all available substance abuse services under one program, before transitioning to the other program, thereby exhausting all services under both SAIOP and SACOT programs during the Medicaid fiscal year. Even after exhausting all available benefits under both programs, LIFE TOUCH continued to provide gift cards to patients and to re-enroll patients in SAIOP and SACOT from year to year.

31.     LIFE TOUCH received as much as $25 Million in NC-Medicaid substance abuse service proceeds during the same period that it gave more than $1 Million in gift cards to its substance abuse patients.

## C. Scheme to Defraud Medicaid Concerning Payment of Kickbacks to LIFE TOUCH Patients

32.     **January 2018 Eastpointe Audit.** In January of 2018, Eastpointe Program Integrity conducted an audit of LIFE TOUCH involving alleged payment of

gift cards to patients (hereinafter the "January 2018 Eastpointe Audit"). In particular, Eastpointe auditors were investigating an allegation by a NC-Medicaid recipient. This recipient had alleged that he/she had been approached by an individual and told that if they provided their Medicaid number to LIFE TOUCH, and attended substance abuse classes offered by LIFE TOUCH, they would be given a Visa gift card for each class they attended.

33. The January 2018 Eastpointe Audit included among other things, interviews of LIFE TOUCH patients, reviews of claims data, an on-site visit to LIFE TOUCH, LIFE TOUCH employee interviews, and a request for document production. The document production specifically called for the medical records of fifteen identified patients; personnel records; LIFE TOUCH's policies and procedures for providing substance abuse services, soliciting members, billing claims, conducting/processing drug screens, discharge criteria and gift giving to members; and the Eastpointe Provider Operations Manual.

34. Upon conclusion of the audit, Eastpointe auditors found that LIFE TOUCH had submitted claims for payment without following all federal and state laws, rules, and regulations. Specifically, Eastpointe substantiated that LIFE TOUCH had provided gift cards with monetary value between $45 to $60 to LIFE TOUCH patients receiving SAIOP services, depending on their attendance.

35. Notably, the January 2018 Eastpointe Audit did not entail a comprehensive examination of all of LIFE TOUCH's Medicaid billings for substance abuse services. Instead, only approximately 1,052 claims of the member sample,

covering only a period between January 1, 2017, and December 31, 2018, were reviewed as a part of the audit. As such, auditors found that $14,325.77 in Medicaid proceeds should be recouped from LIFE TOUCH, since such proceeds resulted from the payment of kickbacks, in the form of gift cards, to patients in part to encourage members to receive SAIOP services from LIFE TOUCH during the dates under review.

36.     Nevertheless, LIFE TOUCH was given written notice of the substantiated kickback allegation, and also written guidance from the United States Department of Health and Human Services, Office of the Inspector General (OIG), concerning the unlawfulness of providing valuable incentives to patients receiving services.

37.     **Subsequent Audits.**     Even after being warned of the potential illegality of the payment of gift cards to patients, LIFE TOUCH, by and through its employees and agents, including K.S., F.S., K.J., continued to pay gift cards to patients.     As such, NC-Medicaid continued to receive complaints regarding the payment of gift cards to patients.     These complaints resulted in additional investigations, record requests from LIFE TOUCH, and interviews of LIFE TOUCH employees, agents, and patients.

38.     In response to these audits, rather than providing truthful information and genuine records to auditors, LIFE TOUCH, by and through its agents and employees, engaged in a scheme to trick Eastpointe, and NC-Medicaid generally, into

11

believing that gift cards were no longer given to patients by LIFE TOUCH when, in fact, they were.

39.    During the course of the scheme, LIFE TOUCH's agents and employees attempted to deceive NC-Medicaid regarding LIFE TOUCH's ongoing purchase and dissemination of the gift cards. They did this by, among other things, making it appear that third parties were purchasing and providing gift cards to LIFE TOUCH patients. These third parties included nonprofits known as "Refuge House of God," and Changing Lives Community Resources, LLC, known as "Changing Lives."

40.    In a further effort to deceive NC-Medicaid, during a 2021 audit, a LIFE TOUCH's manager and compliance director informed auditors that LIFE TOUCH did not provide incentives anymore and that a third-party nonprofit, Refuge House of God, provided gift cards to recipients. When interviewed again in reference to a 2022 audit, K.J. again informed Eastpointe auditors that LIFE TOUCH did not give gift cards to patients, and a third-party, Changing Lives, provided gift cards to LIFE TOUCH recipients.

41.    In a further effort to conceal the purchase and dissemination of the gift cards to LIFE TOUCH patients, LIFE TOUCH employees and agents used financial accounts other than LIFE TOUCH's business accounts to purchase the gift cards. Specifically, accounts in the names of LIFE TOUCH managers, and others were used to purchase large quantities of gift cards, which were then disseminated by LIFE TOUCH staff. Although purchased in the names of other individuals, LIFE TOUCH financed and delivered the gift card purchases.

42.     By way of example, more than 5,700 gift cards, totaling in excess of $460,000, were purchased through K.S.s' Navy Federal Accounts. These accounts were funded primarily through monies that originated from LIFE TOUCH's business accounts and large cash deposits.

43.     It was also a part of the scheme to make it appear that gift cards were not routinely being given to patients, LIFE TOUCH office managers generated false and fraudulent documents that were provided to LIFE TOUCH recipients, LIFE TOUCH staff, and Eastpointe. These documents included such false statements as "Life Touch LLC does not do motivational incentives." Recipients were required to acknowledge receipt of the documentation and signed copies were filed in patient charts. LIFE TOUCH office managers also created patient consent forms that made it appear as though information on patient progress could be shared to outside parties, such as Refuge House of God and Changing Lives, to facilitate the delivery of rewards by those outside entities when, in fact, LIFE TOUCH and its staff were purchasing and delivering the gift cards to patients. LIFE TOUCH office managers and others also directly told patients that gift cards were not being provided by LIFE TOUCH, when, in fact, they were. All of these false statements and documents were part of a ploy to deceive and defraud the Medicaid program regarding the ongoing payment of gift cards to patients.

44.     Based upon the foregoing scheme, Eastpointe auditors were unable to substantiate LIFE TOUCH's ongoing payment of gift cards to patients, to recoup

13

funds associated with such conduct, or to otherwise take appropriate action to address the ongoing gift card payments.

45. **Civil Fraud Investigation.** Following the Eastpointe audits, MID initiated an investigation into LIFE TOUCH which included, among other things, the giving of gift cards as incentives to patients. As part of the investigation, documents were requested, and interviews of employees were conducted. Rather than provide truthful information and answers, LIFE TOUCH provided false documents and false statements.

46. By way of example, LIFE TOUCH created fraudulent consent forms which were documents that made it appear to LIFE TOUCH's patients on paper that LIFE TOUCH was exchanging, receiving, or releasing information with Refugee House of God and Changing Lives Community for the purpose of Refugee House of God and Changing Lives Community giving the gift cards as incentives to the patients. These false consents were produced to MID in response to its request for documents.

47. By way of example, a LIFE TOUCH's manager and compliance director informed MID during an interview, that LIFE TOUCH was no longer giving gift cards, and that LIFE TOUCH did give gift cards at one time, but they stopped giving them to clients after an audit by Eastpointe in 2018. She further represented that LIFE TOUCH only provided gift cards for a period of about six months, covering a part of 2017 and 2018 and after the Eastpointe investigation, the cards to LIFE TOUCH's clients were from a third party, "Refugee House" and "Changing Lives." In

14

reality, Changing Lives was not an operational entity and was used only as part of the scheme.

### D. Tax Filings

48.    BRANDON SIMS managed and advised upon the operations of LIFE TOUCH from, among other locations, his home in Texas.

49.    In addition to drawing a regular salary from LIFE TOUCH, BRANDON SIMS extracted various other income from LIFE TOUCH and other locations in the form of wire transfers, cash withdrawals, and purchases drawn from LIFE TOUCH accounts.

50.    BRANDON SIMS did not file tax returns to account for this income and, as such, did not pay over federal income taxes to the Internal Revenue Service (IRS). Likewise, BRANDON SIMS did not cause LIFE TOUCH to file income tax returns with the IRS.

### COUNT ONE
### Health Care Fraud
### 18 U.S.C. § 1347

51.    Paragraphs 1 through 50 of this Criminal Information are realleged and incorporated by reference.

52.    Beginning at a time unknown, but no later than October 1, 2019, and continuing to a time unknown, but no earlier than November 16, 2023, in the Eastern District of North Carolina and elsewhere, the defendant, LIFE TOUCH, by and through one or more of its employee(s) and for the benefit of LIFE TOUCH, did

15

knowingly and willfully execute and attempt to execute a scheme and artifice to: (1) defraud a health care benefit program, to wit, Medicaid, and (2) obtain by means of materially false and fraudulent pretenses, representations, and promises, any of the money or property owned by, and under the custody or control of said health care benefit program; in connection with the delivery of and payment for health care benefits, items, and services.

All in violation of Title 18, United States Code, Section 1347.

### COUNTS TWO, THREE, FOUR AND FIVE
**Failure to File Tax Returns**
**26 U.S.C. 7203**

**53.**　　Paragraphs 1 through 50 of this Criminal Information are realleged and incorporated by reference.

**54.**　On or about the dates set forth below, in the Eastern District of North Carolina and elsewhere, BRANDON SIMS, defendant herein, having received taxable income on which taxable income there was owing to the United States of America an income tax; and by virtue of such income, was required by law to pay, on or before April 15 of each charged year, that income tax to the Internal Revenue Service Center, to a person assigned to receive returns at the local office of the Internal Revenue Service, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, BRANDON SIMS did knowingly and willfully fail to pay the income tax due.

| COUNT | OFFENSE DATE |
|---|---|
| TWO | April 15, 2021 |
| THREE | April 15, 2022 |
| FOUR | April 15, 2023 |

16

| FIVE | April 15, 2024 |
|------|----------------|

Each row of the foregoing table constituting a separate violation of Title 26, United States Code, Section 7203.

## FORFEITURE NOTICE

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any Federal health care offense as defined in 18 U.S.C. § 24(a), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the said offense.

The forfeitable property includes, but is not limited to, the following:

Forfeiture Money Judgment:

a) A sum of money representing the gross proceeds of the offense(s) charged herein against LIFE TOUCH LLC, in the amount of at least $25,000,000.

Real Property:

b) Real property located at 919 Enclave Lake Drive, Houston, Texas, including any and all appurtenances and improvements thereto, as more particularly described in a Special Warranty Deed with Vendor's Lien recorded as Instrument Number Rp-2022-392295 of the Harris County Records, Texas, and being titled in the name of Brandon E. Sims, more particularly described as

17

follows:

> Lot Forty-one (41), in Block One (1), of Parkway Villages, Section Four (4), an addition in Harris County, Texas according to the map or plat thereof recorded in Film Code No. 355002 of the Map Records of Harris County, Texas.
>
> PIN: 117-615-001-0041

c) Real property located at 49 Sullivans Landing, Missouri City, Texas, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded as Instrument Number 2023008945 of the Fort Bend County Records, Texas, and being titled in the name of the B. Sims Experience LLC, more particularly described as follows:

> Lot Twenty-Nine (29), in Block One (1), of SIERRA VILLAGE OF WATERS LAKE SECTION Two (2), a subdivision in Fort Bend County, Texas, according to the map or plat thereof recorded in Slide No. 1770/A of the Plat Records of Fort Bend County, Texas.
>
> PIN: R228520

d) Real property located at 229 Amy Overlook, Atlanta, Georgia, including any and all appurtenances and improvements thereto, as more particularly described in a Quitclaim Deed recorded in Book 66622, Page 97 of the Fulton County Records, Georgia, and being titled in the name of Experienced Rentals LLC, more particularly described as follows:

> All that tract or parcel of land lying and being in Land Lot 159 of the 9F District, Fulton County, Georgia, being Lot 87, Phase II, Champions Park Subdivision, as shown on plat recorded in Plat Book 300, Pages 2-7, Fulton County, Georgia Records, which said plat is being incorporated herein by reference thereto. Reference: 229 Amy Overlook, Atlanta, GA 30349.
>
> PIN: 09F-3900-0176-493-5

18

e) Real property located at 6728 Willowbrooke Drive, Apartment 2, Fayetteville, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 11721, Pages 0613-0615 of the Cumberland County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

> BEING all of Unit 5, in a subdivision known as STEWART'S CREEK CONDOMINIUMS II, PHASE 2, according to a plat of the same duly recording in Condominium Book 1, Pages 61-70, Cumberland County Registry, North Carolina. Subject to the rights, privileges, appurtenances, easements, obligations, covenants, conditions and restrictions contained and described in the Declaration, and together with the undivided fractional interest in the common areas and facilities as established in the Declaration recorded in Book 3056, Page 689, and the Supplemental Declaration recorded in Book 3089, Page 529-533, Cumberland County Registry, North Carolina. The above described property was acquired by the Grantor by instrument recorded in Book 10455, Page 823, Cumberland County Registry.

> PIN: 9498-51-9929-105

f) Real property located at 342 Waterdown Drive, Apartment 11, Fayetteville, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 11721, Pages 0613-0615 of the Cumberland County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

> BEING all of Unit 11, Section II, Phase Thirteen, THE CROSSINGS AT MORGANTON CONDOMINIUMS, as recorded in Condominium Book 4, Page 160, Cumberland County Registry with the ownership interest, privileges, appurtenances, conditions and restrictions contained and described in the Declaration of The Crossings at

Morganton Condominiums recorded in Book 3885, Page 738, Cumberland County Registry, North Carolina. The above described property was acquired by the Grantor by instrument recorded in Book 10836, Page 546, Cumberland County Registry.

PIN: 0408-72-2529-311

g) Real property located at 121 Taylor Heights Street, Hookerton, North Carolina, included any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 762, Pages 596-598 of the Greene County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

Beginning at a point on First Street Extended, 5 feet from the western side of the line between Lots No. 31 and 32 and runs with Lot No. 31 to Contentnea Creek; thence in a westerly direction with the various courses of Contentnea Creek to a point 5 feet from the line between Lots No. 35 and 36 on said creek; thence in a southerly direction parallel with the line of Lot No. 35 to a point on First Street Extended 5 feet from the line between Lots No. 35 and 36; thence in an easterly direction with said First Street Extended to the point of beginning. The above described property was acquired by the Grantor by instrument recorded in Book 744, Page 917, Greene County Registry.

PIN: 0300535

h) Real property located at 208 South Third Street, Hookerton, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 762, Pages 593-595 of the Greene County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

BEGINNING at a stake on Third Street, Kenneth McLawhorn's corner, and runs with Third Street in a Northerly direction 61 feet to Ethelene J. Hill's corner; thence with Ethelene J. Hill's line in a

20

Westerly direction 146 feet to Robert Jones's line; thence with Robert Jone's line 61 feet to Kenneth McLawhorn's corner; thence with Kenneth McLawhorn's line 146 feet to the beginning, and being a portion of the lot of land conveyed to A.L. Wood by B.F.D. Albrittion and others by deed recorded in the Public Registry of Greene County in Book 239, Page 420, to which reference is hereby made. It being the identical tract or parcel of land conveyed by A.L. Wood and wife, Lillian B. Wood to Raymond Mewborn on January 6, 1953 and recorded in Book 270, Page 457 of the Greene County Register of Deeds Office. It being the identical tract or parcel of land conveyed by Raymond Mewborn and wife, Lila Mae J. Mewborn to Junius Faircloth and wife, Irene Faircloth on April 1, 1976 and recorded in Book 405, Page 23 of the Greene County Register of Deeds Office. The above described property was acquired by the Grantor by instrument recorded in Book 746, Page 4, Greene County Registry.

PIN: 0300356

i) Real property located at 3305 Chris Street, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 439-443 of the Lenoir County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

BEING Lot 25B, Section A, Village Cedars as depicted and delineated on a map entitled "RECOMBINATION SURVEY FOR VERNON DOUGLAS FREEMAN - REDIVISION OF LOTS 25A, 25B, 26A AND 26B, SECTION A, VILLAGE CEDARS (PC 3, P 345)" dated February 8, 2002, prepared by Atlantic Surveying, P.A., and appearing of record in Plat Cabinet 8, Page 20, Lenoir County Registry. Reference to said map is hereby made and incorporated herein for a more detailed description. Also being a portion of the property conveyed by Deed recorded in Book 1235, Page 556 and corrected by Correction Deed recorded in Book 1329, Page 865, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1928, Page 273, Lenoir County Registry.

PIN: 451614340519

j) Real property located at 3307 Chris Street, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 439-443 of the Lenoir County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

> BEING Lot 25A, Section A, Village Cedars as depicted and delineated on a map entitled "RECOMBINATION SURVEY FOR VERNON DOUGLAS FREEMAN - REDIVISION OF LOTS 25A, 25B, 26A AND 26B, SECTION A, VILLAGE CEDARS (PC 3, P 345)" dated February 8,2002, prepared by Atlantic Surveying, P.A., and appearing of record in Plat Cabinet 8, Page 20, Lenoir County Registry. Reference to said map is hereby made and incorporated herein for a more detailed description. Also being a portion of the property conveyed by Deed recorded in Book 1235, Page 556 and corrected by Correction Deed recorded in Book 1329, Page 865, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1928, Page 273, Lenoir County Registry.

> PIN: 451614249578

k) Real property located at 1010-1012 West Lenoir Avenue, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

> Being situate on the south side of West Lenoir Street and beginning at the southeast corner of the intersection of West Lenoir Street and Carey Road, and runs with the line of West Lenoir Sheet S 70-30 E 75 feet to a stake, the corner of Lot #2 in Block "F" as shown on map hereinafter referred to; and runs thence S 12-30 W with the western line of said Lot #2 150.5 feet to a stake, the southwest corner of said Lot No, 2; and runs thence N 77 -30 W 75 feet to a stake in the eastern line of Carey Road; and runs thence N 12-30 E with the line of Carey

Road 150.5 feet to the point of beginning, and being Lot #l in Block "F" as shown on map of record in the office of the Register of Deeds of Lenoir County in Map Book 3, Page 94, reference to which is here made. This being the same property described in and conveyed by that certain Deed recorded in Book l343, Page 566, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1928, Page 714, Greene County Registry.

PIN: 451512953619

l) Real property located at 706 Colony Place, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

BEING Lot No. Four (4) as depicted on a map entitled "Map for Record, Heritage Townhomes, Phase l - Part l" dated July 17, 1984, prepared by Stroud Land Surveying Co., and appearing in Plat Cabinet 2, Slide 94, Page 187, Lenoir County Registry, reference to which is hereby made for a more detailed description. The above described property was acquired by the Grantor by instrument recorded in Book 1930, Page 504, Greene County Registry.

PIN: 452505195652

m) Real property located at 303 East Capitola Avenue, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

BEGINNING at an iron stake found in the southern right-of-way line

23

of East Capitola Avenue, said iron stake being located by beginning at the junction of the southern right-of-way line of East Capitola Avenue and the eastern right-of-way line of Independence Street and running along said right-of-way line in an easterly direction 100 feet to the point of beginning; thence running from said beginning point so located with the southern right-of-way line of East Capitola Avenue South 83 degrees 30 minutes East 58.8 West 146.82 feet to an iron stake; thence it runs North 83 degrees 58 minutes 50 seconds West 59.22 feet to an iron stake; thence it runs North 07 degrees 24 minutes 38 seconds East 147.5 feet to the point or place of beginning. The above described property was acquired by the Grantor by instrument recorded in Book 1932, Page 217, Greene County Registry.

PIN: 452540466380

n) Real property located at 1001 Clifton Terrace, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

Located on the Northwest corner of West Road and Clifton Terrace, formerly Manoah Avenue, and being Lot No. Nine (9), as shown on map of "Part I of Section J", as developed by Perry Park, Inc., which said map is recorded in Map Book 4, Page 149, Lenoir County Registry, reference to which is hereby made for an accurate description, and being further described as follows: Beginning at a stake on the North side of Clifton Terrace, formerly Manoah Avenue, said stake being the Southeast corner of Lot No. 13, as shown on said map, and runs thence northwestwardly with the line of Lot No. 13, 101.6 feet to a corner which is common with Lots Nos. 8, 9 and 13, as shown on said map; thence it runs northeastwardly with the South side of said Lot No, 8, 100 feet to West side of West Road; thence it runs with the West side of West Road S. 16-30 E. 115 feet to a stake; thence it runs southwestwardly 18.3 feet to the North side of said Clifton Terrace a stake located N. 88-00 E. from the beginning corner; thence it runs with Clifton Terrace S. 88-00 W. 103 feet to the point of beginning. It being one of the lots conveyed by Perry Park, Inc., to O. L. Shackelford by deed dated July l, 1952, and recorded in the

Lenoir County Registry. And also being the same lot of land conveyed by O. L. Shackelford and wife, to Arthur D. Shackleford and wife, by deed dated November 7,1952, and recorded in the Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1932, Page 719, Greene County Registry.

PIN: 452505080961

o) Real property located at 2341 Villa Drive, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

BEING all of No. Lot 10A in Section B as same is shown and delineated on a map of Village Cedars, Section B, said map being recorded in Plat Cabinet 2, Slide 67, Page 133 in the Office of the Register of Deeds of Lenoir County, reference to said map being hereby made for a more particular description. This being the same property conveyed to Polly W. Odom by deed recorded in Book l37l at Page 818, in the Lenoir County Registry. The above detailed property was acquired by the Grantor by instrument recorded in Book 1932, Page 882, Greene County Registry.

PIN: 451614347834

p) Real property located at 1511 West Road, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 439-443 of the Lenoir County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

Located in the east side of West Road, and being Lot. No. 30, as shown on "Map of record of Part 2, Section J, and Tract 33 of Section K of Perry Park, as developed by Perry Park, Inc.", said map being

25

made by Meriwether Lewis, R.S., October 5, 1953, and recorded in Map Book 5, Page 40, Lenoir County Registry. It being a part of Tract No. 12, as described in the Deed from Bliss P. Carey, et als, to Perry Park, Inc., dated May 24, 1952, and recorded in Book 294, Page 333, Lenoir County Registry. Being the same property conveyed to Melvin A. Scott, Jr., and wife, Kathy P. Scott, by Deed from Barbara B. Adams, dated June 30, 1989, and recorded in Book 898, Page 647, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in book 1938, Page 396, Lenoir County Registry.

PIN: 452505090297

q) Real property located at 2508 Forrest Drive, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 439-443 of the Lenoir County Records, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

BEING Lot 16 as shown on that map of Castle Oaks, Section 2, "Revised", dated August 22,1973, as the same appears of record in Map Book 17, Page 19, Lenoir County Registry, and being the same property conveyed in Book 673,Page 544, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1939, Page 828, Lenoir County Registry.

PIN: 359604810882

r) Real property located at 2800 Brookhaven Drive, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 439-443 of the Lenoir County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

BEING LOT NO. 2, BLOCK 'E', as shown upon "Map for Record

26

"WESTWOOD developed by Old South Realty, Inc., Kinston Township, Lenoir Co., N.C." dated October 15,1974 and appearing of record in Map Book 17, Page 64, Lenoir County Registry, to which said map reference is hereby made for a more particular description, the said map having been prepared by Linwood Stroud, P.E. 5279. The same property acquired by Romona W. Boyd by Deed recorded in Book 1187, Page 517, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1943, Page 292, Lenoir County Registry.

PIN: 451611770286

s) Real property located at 3232 Caroline Nicole Drive, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 439-443 of the Lenoir County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

BEING all of Lot No. 15, as shown on that certain map entitled "MAP OF WHITFIELD ACRES, SECTION A" dated February 12,1990, made by Greene Engineering, P.A. and appearing of record in Plat Cabinet 4, Page 77, Lenoir County Registry, reference to said map being hereby made for a more particular description of said lot. The above described property was acquired by the Grantor by instrument recorded in Book 1943, Page 723, Lenoir County Registry.

PIN: 358600955166

t) Real property located at 2320 Stallings Drive, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

BEING all of Lot No. 9 as shown on that certain map entitled "Plat of Wait's Woods North, Owned by H & H Development Corp. and

East Car. Service Corp." dated May 8,1975, and prepared by Averette & King Engineering Co., P.A. said map appearing of record in Map Book 17, Page 99, Lenoir County Registry, reference to which is hereby made for a more detailed description. The above described property was acquired by the Grantor by instrument recorded in Book 1945, Page 236, Greene County Registry.

PIN: 451612957323

u) Real property located at 2100 Riley Road, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

Being all of the certain piece of property denominated as Lot l, containing 0.637 acres, more or less, shown on that map entitled "Property of James Parrott Hayes and wife, Juanita Hayes" appearing of record in Plat Cabinet 9, Page 72, Lenoir County Registry, reference to which is hereby made for a more accurate description. This being all of Lot 1 and a portion of Lot 4, Section A, as shown on Map No. 3 of Wait's Woods, appearing of record in Map Book 7, Page 10, Lenoir County Registry. The above described property was acquired by the Grantor by instrument recorded in Book 1947, Page 297, Greene County Registry.

PIN: 451612757268

v) Real property located at 3202 Chris Street, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a Warranty Deed recorded in Book 1987, Pages 427-431 of the Lenoir County Records, North Carolina, and being titled in the name of Pridgen Investments, LLC, more particularly described as follows:

BEING all of Lot No. 15A in Section A in Village Cedars Subdivision, a map of which is recorded in Plat Cabinet 3, Page 345, in the office

28

of the Register of Deeds of Lenoir County, reference to said map being hereby made for a more perfect description of said Lot No. 15A in Section A. This conveyance is made subject to those certain restrictive and protective covenants recorded in Book 907, Page 240 in the office of the Register of Deeds of Lenoir County. The above described property was acquired by the Grantor by instrument recorded in Book 1951, Page 349, Greene County Registry.

PIN: 451614345403

w) Real property located at 2344 Highway 903 South, Snow Hill, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in a General Warranty Deed recorded in Book 752, Pages 714-716 of the Greene County Records, North Carolina, and being titled in the name of Brandon E. Sims, more particularly described as follows:

BEING all of that tract or parcel of land containing 36.92 acres, more or less, including right of way, which is shown, depicted and delineated on a map entitled *SURVEY FOR JOHNNY MILTON TURNAGE, JR (OWNER)", prepared by James D. Grant, Professional Land Surveyor, dated March 30, 2022, recorded in Map Book 33, at Page 133, Greene County Registry, reference to which map is hereby made for a more perfect description.

PIN: 0801209

x) Real property located at 1202 Harding Avenue, Kinston, North Carolina, including any and all appurtenances and improvements thereto, as more particularly described in an Executrices' Special Warranty Deed recorded in Book 1958, Pages 131-134 of the Lenoir County Records, North Carolina, and being titled in the name of Lanier & Associates, LLC, more particularly described as follows:

Located on the south side of Harding Avenue, beginning at a stake on the south side of Harding Avenue 150 feet west from the

southwest corner of the intersection of LaRoque Street and Harding Avenue, said stake being at the northwest corner of the lot now owned by W. R. Gray and wife, thence it rounds south and parallel with LaRoque Street and along the western boundaries of Gray and Williams lots 200 feet to a stake, thence west and parallel with Harding Avenue 100 feet to a stake, thence north and parallel with the first line 200 feet to a stake in the south boundary of Harding Avenue, thence east with the southern boundary of Harding Avenue 100 feet to the beginning, it being a part of the D.E. Perry heirs' property. And being the same property conveyed to Robert L. Thompson, Jr., and wife, by Bliss P. Carey at als by deed dated July 28, 1950 and recorded in Book 278, Page 280, Lenoir County Registry.

PIN: 451512866673

Personal Property:

y) A 2021 Rolls Royce Cullinan, VIN: SLATV4C02MU205598, registered to Experienced Rentals, LLC, a company owned by Brandon Sims, seized on November 16, 2023.

z) A 2020 Chevrolet Silverado, VIN: 1GCUYEED3LZ169500, registered to Experienced Rentals, LLC, a company owned by Brandon Sims, seized on November 16, 2023.

aa) A 2021 Chevrolet Corvette Stingray, VIN: 1G1YC3D49M5123161, registered to Brandon Sims, seized on November 16, 2023.

bb) $1,300,000 in U.S. Currency seized from 919 Enclave Lake Drive, Houston, TX 77077 on November 16, 2023

cc) $4,802.38 seized from Bank of America Account #XXX9419. held in the name of Life Touch and Brandon Sims on November 16, 2023.

dd) $21,055.17 seized from Bank of America Account #XXX8520. held in the name of Life Touch and Brandon Sims on November 16, 2023.


If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the

30

jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.


DANIEL P. BUBAR
Acting United States Attorney


BY: TASHA C. GARDNER
Special Assistant United States Attorney